Good morning, your honors. May it please the court, Kenneth M. Stern for appellants. In this case, my client's son is dead today because an officer was too vain to wear his eyeglasses, as he had been told twice by a doctor, that he needed to be wearing, particularly at night. Was he, was Luna the only one who thought he had a gun? Well, all of the officers said... Was Luna the only one who thought he had a gun? No, they all claimed they thought he had, either they thought he had a gun, or they didn't know what he had, they were speculating as to whether or not he had a gun. Let's take a little, a bit of a look at his frame of mind. I mean, I'm reading the calls, and he called 911 to report this is going on, is that right? Yes, he did. And he said that, and I will leave out the expletives, back off. He wanted the officers to back off, is that right? Yes. And that he told them he had a gun, and a positive, and a probable destructive device. He did, but that was never communicated. I understand that, but that was his frame of mind, back off, I have a gun. So now, I've seen, we've all seen the videos, he's out of the car, and he's turning around in a stance, and pointing something at him. Now doesn't that show his frame of mind, he's trying to get them to back off, he has a gun? No, I believe he was... Well, that's what he said, he wanted to have happen. But, I believe if you look at his action, he's holding it up, a gun isn't four and a half inches wide. I believe he was trying to get that camera to work to... Well, you believe that, but what he said was, I've got a gun, back off. You believe he was trying to get the camera to work, but what he was saying is, tell them I've got a gun, it's going like this, back off. Well, I believe a jury could find that he was trying to film what was going on, and I think you need to back up a step. What should the officers done? Well, first of all, let's even get to the point, if I may... The one said, I'm not going to bury Officer Luna tonight. That's right, but before he would even stop, the command told the officers, back off, back off following him, and they refused, they said, no, we're not going to. And it's interesting, because there was an incident here in LA, the LA area... Is this in the record? No, but I was going to just make an argument of it, that the police chased the guy for about two hours, finally they said, well, we know who he is, let's just back off and we'll go and arrest him later. You have the same situation here, when he was speaking to dispatch, he gave them his license number, he gave them his name, they were talking to his mother, they knew who he was, they could have backed off and let the helicopter chase him or just go arrest him later. He hadn't committed a felony, he hadn't committed a serious crime. Well, then he turned his car and they had no idea what he was going to do, it looks like he might start running counter the traffic in that lane. And they didn't ram the car, they bumped it, I mean, I watched it, it wasn't a ram. Well, he couldn't have, because there was not another lane... And he said, look, I've committed a felony, you know, I'm on the run. Yeah, the officers have no idea what he's doing at that point, he's starting to make a U-turn on the 101, and he may or may not be successful, maybe he's run out of gas, maybe he hasn't run out of gas, they have no idea what he's done. And if he's got a full tank, he can back the car up from the median and head back in the opposite direction, I mean, this is a very, very strange move. Well, they had him boxed in, so I think a jury could find that, they had him boxed in, he couldn't move. But then he got out and started to run, and he turned around. Well, here's what Officer Luna himself said, and this is also testified to by Mr. Clark, the expert. But Officer Luna himself says, you know, the appropriate thing would have been to wait behind the doors of the vehicles to see what was going to happen, to see what the situation was, to give him warnings. They didn't do that. If they did that, if they did that, instead of charging at him immediately with their guns pointed, they could have waited to see what happened, they could have given him warnings, which two of the officers said no, no warnings were given. They could have done that, and it was unreasonable not to, even by Officer Luna's own testimony that this is what we should have done. Secondly, if Officer Luna admitted, if he was wearing glasses, he may well have seen that it was a cell phone and not a gun. Yeah, but these officers all fired simultaneously. Luna's not the only one, and he's not the only one that's close to him. He was the one most directly. He was 10 feet facing him. He could have told the other officers, hey, don't shoot. He didn't fire at the guy because the guy was running away. This is not a shoot him in the back while he was running case. He didn't fire until what? When did he fire? They didn't start firing until he was turned around running away, and he was shot in the back several times. But it shouldn't have gotten to that point because the burden of proof shifts to Officer Luna to prove that even if he had been wearing glasses, he still would not have seen that. If Luna's the only one involved here, you know, this point probably would be well worth pursuing. But he's not the only one. He's not the only one who shoots. There's not even any evidence that he was the first one to shoot. That's true. There were a lot of shots fired here, and it appears that they were fired simultaneously. Well, I don't know, simultaneously. But, again, if they had done what they reasonably should have done, what a jury could reasonably found that they should have done, which was to back off, go arrest him later. They're not going to do that, to stay behind the protection of their vehicles, see what develops, give him warnings instead of just the moment that they stop him, start charging at him with guns, which, by Officer Luna's own testimony, was not the appropriate thing to do. A jury could find this would have never happened if the officers were not reasonable. Counsel, you have two big hurdles to get over. The first is that you've got to convince the panel the district court is wrong on its ruling on the Fourth Amendment on the constitutional question. What are you going to do about qualified immunity? Well, that's really what I wanted to start out with, was discussing Sheehan a little bit. Sheehan does not, as appellee's counsel says, say that whenever you just ignore an expert's testimony. It says you can do that if it otherwise complies with the requirements of qualified immunity. It talks about, uses words like simply and by itself. So if there are other facts a jury can find that... But you've got to be able to demonstrate that a jury would conclude not only that this was a Fourth Amendment violation, but that it was so obvious that no reasonable officer would have behaved in this way, much less the seven who did. Well, this is a mistake of fact case. And I believe the standards are set forth that no reasonable officer courting Officer Luna. The various factors that I've already mentioned regarding the Fourth Amendment violation and the unreasonable officer's conduct, all of these are factors that a jury could also find show that the case law puts them on notice that you can't shoot an unarmed person in terms of reasonable mistake. Right. In order to get around the qualified immunity inquiry, though, you're basically going to have to give us a case that the officers should have read. And had they read the case, they would have known that they could not fire in these circumstances. I think the Johnson Bay case. I believe the Torres... And these are all cited in my briefs. The Torres v. City of Madera case. The Wilkins v. City of Oakland case. The Jensen v. City of Oxnard case. The Espinoza v. City and County of San Francisco case. I believe, especially in mistake of fact cases, I believe all set forth standards that show that a jury could find that a reasonable officer should not have done what they did and that the law had been established that they couldn't. Is there any evidence that disputes this? It's Officer Luna. No. The first time when I came around his vehicle, he was up on me in a two-handed shooting stance. I drew my pistol, pointed at him, and that's when he ran eastbound. I hadn't fired at that point. He ran eastbound maybe 15 to 20 yards, turned on me again with a two-handed shooting stance holding the shiny object, and that's when I fired. Is there any evidence that disputes that sequence of events? I think all three of the videos dispute that because I don't believe running backwards holding a... Well, shooting stance. I don't believe running backwards is a shooting stance. He was never... He says he turned on me again, and that's when I fired. And when he turned again, he was again running backwards. I don't believe that... But he was facing the officer like this, right? He was facing the officer. But back up to the other piece of information your Honor said, I think it also shows that's not correct. I believe your question or your statement was that Officer Luna said that... Didn't shoot him at first. He waited. Well, he waited to see what my client's son was going to do. He didn't wait. He was already out chasing after him with his gun. But he didn't shoot. He didn't shoot immediately. He didn't just start shooting him right on the spot. No, he didn't, but he should have been behind the doors of the vehicles to give warnings, to see what was safe, to see what was going to develop. He was all... And by his own admission, he says this isn't what you do. He was already chasing after him with the gun as my client's getting out of his vehicle. He should not have been chasing him in that way. And I see I'm over my time. You're over your time. We've taken quite a bit of it, and I will afford you time for rebuttal. Thank you. Ms. Bach? Good morning, your Honors. Blythe Bach on behalf of the city and the police. This is undeniably a very sad case, but when it comes down to it, the district court's order was very clear. And I think that this case, it really is remarkably like the Scott case in that we have a videotape which is undisputed and which undeniably shows exactly what happened and exactly what those officers were facing. The appellant's point of view in this case seems to be, in essence, that the officers should have backed off. And I think that the statements made were, see what develops. Well, I think that those videotapes show that a lot had developed. By the time the officers were shooting, Mr. Arion had led them on this high-speed chase, had taken a U-turn on the 101 freeway, had jumped out of the vehicle, and had pointed a black, shiny object at them. It did turn out to be a cell phone. But the officers, in the heat of the moment, are not going to know that. Did anybody ever look at the cell phone to see if it filmed anything? To see if it filmed anything? I am not sure about that. That would be interesting, wouldn't it? To see if he was trying to film. Perhaps he was trying to film. That might have been what he was trying to do. So let's assume that he was, and what consequence flows from that? Well, the consequence does not flow to changing this order, because the issue here, when it comes to qualified immunity in particular, you don't look at it through what actually happened or what Mr. Arion was intending. You look at it through the prism of a reasonable police officer that was on that scene, in that chaotic night in question. And if you look at the videotape, it's remarkable for a few reasons. One, that all of these events unfolded literally in a matter of seconds. It's amazing how quickly it all happened. Secondly, I think it's quite interesting, if you look in particular at the Channel 4 videotape, and that's Exhibit 5 in the record, the newscaster, quite innocently, is narrating his view of the scene. And as he narrates, he's essentially saying what a reasonable perspective is on these events as they unfold. So when Arion first turns, and he's running backwards with his hands in front of him, holding the black object, the cell phone, the newscaster says, Oh wow, wow, I think they're going to shoot him. Oh no, they didn't shoot him. The newscaster is almost shocked that they didn't shoot him at that point. And then, when he, Mr. Arion, runs towards the civilian's car, the newscaster says exactly what the police officers were saying, which is, they were very afraid that he was going to carjack or shoot those civilians that were sitting in the car. Just innocent civilians who had pulled over by the side of the freeway, and the police saw that. And that's exactly what the videotape shows. Did the folks in that car, did they provide any affidavits or any testimony in this case? Apparently they told the police that they were afraid that he was going to shoot them.  It's not in the record, but they did say that. It's not in the record. Right. But what is in the record is, if you look at that video, that he came right next to that car. It is quite scary. And again, the newscaster was shocked. You can hear the jolt in his voice. Where did the bullets hit him? All over, I must say. Excuse me? They did hit him all over. All over. Because at that point, and this is again what your honors were noting, it was not by any stretch just Officer Luna. It was all the officers. Is that seven of them? I believe it's seven in total. And all seven fired? Correct. Yes, by the final shot, they all did fire. The first shot, I believe it's Luna who did not fire, actually, I think, the first round. Excuse me, Luna did not fire the first shot? I believe the first time he saw him, he raised his gun to fire. That's what I was just quoting. Right, right, right, where he initially said he didn't fire, but then the second time he did when he was near the civilian's car. Is that corroborated by the video in your view? It is. Well, it's difficult to say in the video as far as when the shooting is occurring because you can't see the bullet. It's at night and it's hazy. It's difficult to see if there's bullets or shooting. So that part is difficult to see in the video. I did want to actually take the opportunity to correct something in my brief when I was preparing for our argument. I did notice typos, if I could, which is that the testimony of the officers that there was something in the trunk. It's the 911 operator. Mr. Arion told the 911 operator that he had something in his trunk, and a number of the officers testified that they heard that radio transmission. And I just want to give the correct page sites, if I could. The page sites to that testimony are page 336, page 339, page 342, 345, 348, 351, and 354. And this is testimony that the officers did hear what the dispatcher said? The conversation between Arion and the dispatcher. Not that they heard the whole conversation, but they heard the transmission that he had something in his trunk. Was Mr. Arion shot in the back? Yeah, I believe he was, actually, in part. Because he was surrounded at that point when he had his final moment in front of the civilian car. I would also like to note, in response to counsel's comments about Sheehan, Sheehan, as you recall, is the case that appellants cited in the reply brief when it was reversing a qualified immunity finding by this court, and then the Supreme Court later reversed and found qualified immunity. So in the Sheehan case, we certainly did not argue that you would simply ignore an expert declaration. It's just that the expert declaration in that case, and we submitted in this case, is completely irrelevant. The expert declaration in this case essentially went through the officer's tactics and talked about, oh, they could have done it this way, or they should have done it that way. And that's just simply not the analysis that's appropriate for the Fourth Amendment or qualified immunity. You don't look at how this could have been handled. You look at how it was handled, and was that reasonable for an officer faced with this kind of a chaotic situation to handle it that way. And there truly is nothing in the record to indicate that these officers did anything that was outside the line. If anything, they were trying to work with the 911 operator to try to calm this guy down and get him to pull over, get him to stop. It is Mr. Arion himself who created this situation. It's tragic and it's sad. We don't know what was going on in this young man's mind or why he did it. You can tell a lot by listening to what he told the 911 operator. Correct. We don't know what led him to that point where he would be there. We don't know. But for purposes of qualified immunity in the Fourth Amendment, we just have to look at what an officer would do reasonably when faced with this kind of a situation. There's absolutely nothing in the record to indicate that there was anything wrong. I think that the news video in particular leads this case to only one decision, which is the order of the district court. Unless the panel has any other questions, I'll submit. I don't think so. Thank you, Ms. Bach. Thank you. Mr. Stern? Yes, Your Honor. Since I am out of time, I'll try and be as brief and direct to the point as I can. First of all, the standard is whether or not the officers had a fair, whether there was a fair probability that my client presented a danger of death or serious bodily injury either to the officers or to other people. I believe a jury could find that the officer's conduct did not raise to that level. Not a fair probability. Possibility is not enough. Conjecture, surmise is not enough. Obviously, the newscaster's comments are not relevant. I don't think she was offering his testimony because this case didn't turn on that. I think she was suggesting that it might indicate what the officers thought based on what the newscaster thought. Don't you think that's what she was doing? Well, but yes. I mean, she wasn't offering it. I don't know that she was offering it as evidence, but the newscaster is not there. She's not trained, doesn't know the standards. In terms of officers. Let me ask you just one quick question. I don't want to take all your time. Does it matter when we review the record that we see that the deceased person had an opportunity to terminate the whole event at some point in time during the brief interval in which this all was unfolding? Should it matter? I don't believe that it should, Your Honor, because in almost all police shooting cases, a person shot has done something. As in this case, they shouldn't have been doing. And it's not whether they are not culpable or not or whether or not they have or have not done something stupid. It's whether the officers engaged, as a jury might find, engaged in improper and unreasonable tactics. Was the phone recovered? Yes, it was. Did anybody look to see whether he was trying to film what was going on? I don't know that that is in the record, in terms of at least the summary judgment documents. My understanding is I believe the police took the phone and when it was given back there was no video. But I don't know that that was subjected to further forensic analysis. There's nothing on that one way or the other. I don't believe so. Not in the record anyway. In terms of retired Deputy Sheriff Clark, I put a lot in my briefs to show how truly competent and qualified he is. That's true. But I've read the cases and the cases say what could have or would have or should have been done is relevant. It's what happened. Don't the cases say that? Well, I think Smith v. City of Hemet and Lorez v. City of Los Angeles, cited in my briefs, also they say, but not as the end all and be all of it, but police practices such as POST, and POST is a standardized proceedings for all law enforcement agencies in California. It's not some... Peace officer standing training. We know what POST is. Yeah. And I'm not asking this court to say the jury should render a verdict in favor of my clients. I'm saying allow a jury to make these decisions. And I've given the court many instances where the jury could say this was not reasonable and it was not reasonable not only based upon retired Officer Clark's opinions, but, for example, on Officer Luna's opinions himself, on the fact that the officers were told to back off and they didn't. I think you had a scared kid who was afraid of going to prison and it made him act irrationally and it made him act in an unreasonable manner. He was a scared kid. He didn't know what to do. He got himself in over his head. But that doesn't negate the fact that the officers are trained professionals and certainly it's a situation that unfolded very quickly, but they didn't even follow what Officer Luna said they should follow. And also let's not forget there are state law causes of action here also. You know, it strikes me that the minute the officers observed him, he was engaged in very dangerous conduct. He was speeding and blowing red lights just right and left. That endangers anybody who's coming the other way paying attention to a green light. He was putting everybody in danger by doing what he did from the moment they saw him. I don't dispute that, Your Honor. He was doing that, but it didn't raise to the level of felony. And it didn't warrant it. Well, it didn't raise it only by the grace of God. I mean, if he hits a car broadside while he's doing that. You know, I was in law enforcement for a long time, and I handle a lot of cases where people are fleeing, and the next thing you know, you've seen them too. It's common knowledge. Blowing through red lights kills people. And to the grace of God, he didn't ram into somebody. I understand that, and there are many, many, many cases where the courts have said that where the suspect was engaging in much more dangerous conduct. You know, a 3,000-pound car hurtling at speeds like that is tremendous. It's going to kill anybody it hits broadside. That's a very, very dangerous situation. You know that. I do understand that, but I think the court has to look at what happened, what should have happened that a jury can find. You see, and they saw him going through the red light before they were even after him. He was going through red lights when nobody was chasing him, endangering people. They've got to stop this guy, and he just keeps blowing one red light after another. It's not like they came on him when he was doing 40 miles an hour in a 35 zone, turned on the lights, and he takes off. They're paying attention to their own business, and all of a sudden, he blows a red light. He's doing it even before there's a chase. That's true. That's tremendously dangerous. Yes, it is. And dispatch told them to back off. They knew how to get to him. Yeah, but back off. He's already blowing red lights. That's the thing that caught me. It's not that he's blowing red lights because they're chasing him. He's done it already. He's just going through red lights on his own. But regardless of that, I still think you have to look at it from the standpoint, and maybe a jury can certainly factor that in. A jury can take that into consideration. But I think you've got to look at can a jury find that their conduct was unreasonable at the point that he stopped. Usually back off is because the guy's now fleeing because you're chasing him. But this is, okay, back off. And then what? The guy continues to blow through red lights? Okay, let him go. Let him blow through red lights. They could have backed off, and a jury could find him. In other words, not even stop him. He went through a red light. Don't even stop him. Well, they could have followed him with the helicopter, and I think a jury could find this and see what would happen if they backed off. Endangering an awful lot of people in the process. I understand that, and many cases of this court have found that a right to a trial or even a right to a plaintiff's verdict, where the conduct was much more dangerous, where a person had a weapon and it was pointed to people. The Lal case, the officers did look, and they said, Hey, he's got a gun, let's not shoot. Or he doesn't have a gun, he's got a cell phone. I think an officer has to be in a position to be trained to use all of their senses and all of their training, and I don't think we can ignore that. And I think we've got to look at it, even with everything you say, Your Honor, you still have to look at what happens from the time he stops his vehicle, and could a reasonable jury find that the lack of warning, that Luna's not having glasses. Luna himself saying, you know, this is a situation where you stay behind the doors of the vehicle, see what develops, and then take it from there and give warnings. No warnings are given. Tennessee Garner. You know, you rely on what Luna said, but Luna was talking from the standpoint of the officer's safety, not the accused, wasn't he? Well, I think he was talking from the point of everybody's safety, including my client's son, because that's the whole point of the warnings, is for everybody's safety. Is it reasonable to believe under those circumstances with helicopters, the freeway and everything like that, that any warning could have been heard? I think a jury can find that. I think it's up to the jury. I think the jury should be allowed to make that decision. Counsel, we've taken you well over your time. I think we understand your position clearly, so thank you very much. Thank you. Thank both counsel for the argument. Arion v. City of Los Angeles is submitted.
judges: Farris, Trott, Bybee